## IN THE UNITED STATES DISTRICT COURT
### FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| **JAMES JOHNSON,** | |
| **Plaintiff,** | |
| **v.** | **Case No. 18-cv-1374-NJR** |
| **JOHN BALDWIN, JACQUELINE LASHBROOK, MOHAMMED SIDDIQUI, SUSAN KIRK, REVA ENGELAGE, CHAD HASEMEYER, JERRY WITTHOFT, DONNIE LINDENBERG, ANTHONY JONES, KYLE BRUMLEVE, WESLEY ENGELAGE, JOHN MCCALEB, GARRETT GRIFFIN, GEORGE DUDZINSKI, MATTHEW DELANEY, JOHN CARTER, JONATHAN M. HOFFMAN, JOSEPH DOTSON, SETH ELLENBERG, OFFICER COMPTON, and BRIAN ADAMS,** | |
| **Defendants.** | |

## MEMORANDUM AND ORDER

**ROSENSTENGEL, Chief Judge:**

Plaintiff James Johnson, an inmate of the Illinois Department of Corrections ("IDOC") who is currently incarcerated at Lawrence Correctional Center ("Lawrence"), brings this action pursuant to 42 U.S.C. § 1983 for deprivations of his constitutional rights while at Menard Correctional Center ("Menard").

The case is now before the Court on a motion for summary judgment filed by Brian Adams, John Baldwin, Kyle Brumleve, John Carter, Charles Compton, Matthew Delaney, Joseph Dotson, George Dudzinski, Seth Ellenberg, Reva Engelage, Wesley Engelage,

Garrett Griffin, Chad Hasemeyer, Jonathan M. Hoffman, Anthony Jones, Jacqueline Lashbrook, Donnie Lindenberg, John McCaleb, and Jerry Witthoft (Doc. 193). Johnson, through appointed counsel,[1] filed a response in opposition to the motion (Doc. 202). Defendant Dudzinski has also filed a motion to withdraw his admissions (Doc. 203).

## BACKGROUND

### A. Procedural Background

On September 21, 2017, Johnson's Complaint was filed in the United States District Court for the Northern District of Illinois (Doc. 1). On June 27, 2018, that Court conducted a review of Johnson's Complaint, dismissed the claims related to his confinement at Stateville Correctional Center, and transferred the remaining claims to this district (Docs. 10, 11, 12). The undersigned subsequently granted Johnson leave to amend his Complaint (Doc. 18).

On October 3, 2018, Johnson filed his First Amended Complaint alleging various constitutional deprivations he experienced while incarcerated at Menard (Doc. 19). As it relates to the claims against the IDOC Defendants, he was allowed to proceed on the following counts:

| | | |
|---|---|---|
| Count 1: | Baldwin's grooming policy that required Johnson to cut his hair in contravention of his religious beliefs violates Johnson's rights under the First Amendment. | |
| Count 2: | Baldwin's grooming policy that required Johnson to cut his hair in contravention of his religious beliefs violates Johnson's rights under the Religious Land Use and Institutionalized Persons Act ("RLUIPA"). | |

---

[1] Counsel was appointed to assist Johnson on November 17, 2020 (Doc. 155).

Count 3:     Baldwin's grooming policy that required Johnson to cut his hair violates Johnson's equal protection rights under the Fourteenth Amendment because it discriminates against black inmates whose religions and cultures often utilize hairstyles that violate the policy.

Count 4:     Carter and Witthoft violated Johnson's rights under the First Amendment by arranging for his hair to be cut on June 26, 2017, despite his protests that cutting it would go against his religion.

Count 5:     Lashbrook attempted to discourage Johnson from complaining about his treatment at Menard by threatening him with further abuse at the hands of corrections officers, in violation of the First Amendment.

Count 6:     Lashbrook directed corrections officers to subject Johnson to unconstitutional conditions of confinement and excessive force, in violation of the Eighth Amendment.

Count 7:     McCaleb, W. Engelage, Brumleve, Lindenberg, Jones, and Hoffman subjected Johnson to excessive force on June 22, 2017, by beating him in violation of the Eighth Amendment.

Count 8:     Hasemeyer, Dudzinski, Dotson, Ellenberg, Compton, and Adams subjected Johnson to excessive force on June 23, 2017, by beating him or directing others to beat him in violation of the Eighth Amendment.

Count 9:     Witthoft and Dudzinski subjected Johnson to excessive force on June 26, 2017, by beating him or failing to intervene in his beating, in violation of the Eighth Amendment.

Count 10:     Witthoft subjected Johnson to excessive force on June 26, 2017, by sticking him with a needle multiple times, in violation of the Eighth Amendment.

Count 11:     Lindenberg, Dulaney, Dudzinski, Brumleve, McCaleb, W. Engelage, and Griffin subjected Johnson to unconstitutional conditions of confinement by depriving him of meals and running water, forcing him to sleep nude on his cell floor without bedding, and unplugging his fan in the middle of the summer, among other things, in violation of the Eighth

Amendment.

Count 12:    McCaleb and Dudzinski subjected Johnson to cruel and unusual punishment on July 3, 2017, by urinating on his food and spitting in his face, in violation of the Eighth Amendment.

Count 13:    R. Engelage was deliberately indifferent to the injuries Johnson sustained in the June attacks, in violation of the Eighth Amendment.

Count 14:    Defendants intentionally inflicted emotional distress upon Johnson from at least June 22, 2017, to July 3, 2017, in violation of Illinois law and as described in Counts 1-13 herein.

(Doc. 22, pp. 4-5).

Defendants seek only a partial summary judgment. Defendant Baldwin argues that he is entitled to summary judgment on Counts 1, 2, and 3. Defendants Carter and Witthoft seek summary judgment as to Count 4. Hasemeyer seeks summary judgment as to Count 8. Dudzinski seeks summary judgment as to both Counts 8 and 12.

## B.  Factual Background

On June 21, 2017, Johnson transferred from Stateville Correctional Center to Menard (Doc. 193-1, p. 16). During the relevant time period, John Baldwin was the Acting Director of IDOC, Major Carter was a correctional major or shift supervisor, Witthoft was a correctional lieutenant, Hasemeyer was a correctional major or shift supervisory, and Dudzinski was a correctional officer (Doc. 193-3, p. 13; 193-4, p. 8; 193-5, p. 9; 193-6; 193-7).

Johnson is Rastafarian (Doc. 193-1, p. 69). An important part of his religion is to follow a certain diet, particularly wholesome meals (*Id*. at p. 75). Because it is difficult

while incarcerated, he mainly tries to eat a lot of fish (*Id.*). He prays several times a day (*Id.* at p. 76). He has access to religious texts but testified that those texts were confiscated when he went to segregation and also went missing upon his transfer to Menard (*Id.* at pp. 75-76). Although he was able to attend religious services at Stateville, Menard did not have services that met his religious needs (*Id.* at p. 76). He was able to attend Jewish services at Lawrence (*Id.*). As it relates to his hair, Johnson testified that he has taken the Nazarite vow, a promise not to cut one's hair (*Id.* at pp. 69, 75). Prior to transferring to Menard, he had long dreadlocks past his waist (*Id.* at p. 74). He testified that the average prisoner did not have hair as long as his, because he had the style for a long time (*Id.* at pp. 74-75). Major Carter testified that Johnson's hair was long, constrictive braids; the braids could not be manually separated (Doc. 193-4, pp. 33-34).

As it relates to IDOC's grooming policy, "[c]ommitted persons may have any length of hair, sideburns, mustaches, or beards so long as they are kept neat and clean and do not create a security risk." 20 Ill. Admin. Code § 502.110. According to IDOC's Administrative Directive 05.03.160, IDOC may enforce a grooming policy for any offender whose hairstyle poses a security risk (Doc. 193-8, p. 1). A hairstyle may impose a security risk when it (a) "impedes or prevents staff from conducting a thorough search of the hair for contraband; (b) [c]ontraband hidden in the hair may not be detected; (c) [c]ontraband hidden in the hair may injure staff attempting to search the hair; or (d) [t]he hairstyle signifies a security threat group affiliation." (Doc. 193-8, pp. 2-3). Offenders are warned both verbally and in writing and given time to voluntarily remove the hairstyle (*Id.*). The inmate "shall be given an initial 48 hour compliance period," and

a "second 48 hour compliance period may be given prior to removal or cutting of the hairstyle by force." (*Id*. at p. 3). If the inmate fails to comply, he "may be subject to forcible removal or cutting of the hairstyle" by the tactical team (*Id*. at pp. 3, 4-6). Major Carter testified that grooming policies are enforced because weapons or contraband can be concealed within certain hairstyles (Doc. 193-4, pp. 33-34).

Baldwin did not participate in the drafting of the grooming administrative directive (Doc. 193-3, p. 34). Baldwin testified that although, in a broad sense, he was responsible as director for actions that occurred at the prisons, "[t]here were a lot of people who had that responsibility before it would get up to my level." (*Id*. at pp. 14-15). He was not aware of the grooming policy for inmates at Menard because a group of policy people in Springfield write the policies and each facility modifies it to fit their needs as an institution (*Id*. at pp. 15-16). He also did not personally review any grievances about Johnson's hair (Doc. 193-3, pp. 20-22).

On June 21, 2017, Lieutenant Justin Engelage gave Johnson an order to comply with the grooming policy, but Johnson refused to comply and was issued a disciplinary ticket (Doc. 193-2, pp. 3-4). On June 23, 2017, he was given a second order to comply with the grooming policy; he again refused and was issued a disciplinary ticket (*Id*. at pp. 7-8). On June 26, 2017, at approximately 7:45 a.m., he was given a third direct order from Major Carter to comply with the grooming policy and again refused (*Id*. at pp. 2, 6). A tactical team was deployed, and his hair was cut by the facility barber (*Id*. at p. 2; 193-9).

On June 23, 2017, Johnson alleges that excessive force was used against him by officers. He testified that he did not believe that Hasemeyer was the individual involved

in the incident (Doc. 193-1, pp. 60-61, 139). Johnson also testified that the tactical team came to his cell on the 11 to 7 shift on the night of June 22 into the morning of June 23 (*Id.* at p. 134-36). Hasemeyer did work on June 22, 2017, including one hour of overtime (Doc. 202-6). Hasemeyer also signed an incident report regarding Johnson being removed from his cell and taken to the healthcare unit on June 23, 2017, at 4:00 a.m. (Doc. 202-7).

Timesheets for June 23, 2017, and July 3, 2017, indicate that Officer George Dudzinski was not on duty (Doc. 193-7). Dudzinski used seven hours of accumulated holiday time on July 3, 2017 (*Id.*). The daily roster also indicates that Dudzinski was off on July 3, 2017 (Doc. 193-11, pp. 22, 30).

### SUMMARY JUDGMENT STANDARD

Federal Rule of Civil Procedure 56 governs motions for summary judgment. Summary judgment is appropriate if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law. *Archdiocese of Milwaukee v. Doe*, 743 F.3d 1101, 1105 (7th Cir. 2014) (citing Fed. R. Civ. P. 56(a)). A genuine issue of material fact remains "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). *Accord Bunn v. Khoury Enter., Inc.*, 753 F.3d 676, 681-82 (7th Cir. 2014).

In assessing a summary judgment motion, a district court views the facts in the light most favorable to, and draws all reasonable inferences in favor of, the nonmoving party. *Anderson*, 699 F.3d at 994; *Delapaz v. Richardson*, 634 F.3d 895, 899 (7th Cir. 2011). As the Seventh Circuit has explained, as required by Rule 56(a), "we set forth the facts by examining the evidence in the light reasonably most favorable to the non-moving party,

giving [him] the benefit of reasonable, favorable inferences and resolving conflicts in the evidence in [his] favor." *Spaine v. Community Contacts, Inc.*, 756 F.3d 542 (7th Cir. 2014).

ANALYSIS

### A. Baldwin (individual capacity claims)

In his response, Johnson concedes that Baldwin is entitled to summary judgment on Count 3. Thus, summary judgment is **GRANTED** for Baldwin as to Count 3.

Baldwin also argues that he is entitled to summary judgment on the First Amendment claim against him in his individual capacity in Count 1.

As to the First Amendment claim in Count 1 for the grooming policy which required Johnson to cut his hair at Menard, Baldwin argues that he did not have any personal involvement in either creating the policy or the enforcement of the policy against Johnson. An official cannot be liable merely as a supervisor because *respondeat superior*, or supervisor, liability does not apply to Section 1983. *Sanville v. McCaughtry*, 266 F.3d 724, 740 (7th Cir. 2001). In order to be liable under Section 1983, an official must be personally involved in the deprivation. *Gentry v. Duckworth*, 65 F.3d 555, 561 (7th Cir. 1995). An official is not liable for the knowledge and actions of those he supervises. *Vinning-El v. Evans*, 657 F.3d 591, 592 (7th Cir. 2011). A supervisor can be liable "if he directed the conduct causing the constitutional violation, or if it occurred with his knowledge or consent." *Sanville*, 266 F.3d at 740 (citing *Chavez v. Ill. State Police*, 251 F.3d 612, 652 (7th Cir. 2001)). A supervisor can be liable for "deliberate, reckless indifference to the misconduct of subordinates." *Id.* (citing *Chavez*, 251 F.3d at 651 ("The supervisors must know about the conduct and facilitate it, approve it, condone it, or turn a blind eye

Page 8 of 20

for fear of what they might see.")).

Here, there is simply no evidence that Baldwin was personally involved in either creating the policy or enforcing the policy against Johnson. He testified that he did not draft the grooming policy. Those decisions were made by a group of policy officials in Springfield who drafted the administrative directives (Doc. 193-3, p. 15). Baldwin also testified that he had never seen the specific policies on hairstyles and that the policies were set out in the administrative directives and then each institution could modify it to their needs (*Id*.). He also testified that the warden enforced hairstyle policies (*Id*. at p. 16).

Johnson makes much of testimony from Baldwin regarding his role as director. Baldwin testified that "[in] a very broad sense" he was responsible for incidents that happened at Menard. But Baldwin testified that he was responsible for inmates and guards "in an extremely broad sense" and that there were "a lot of people who had that responsibility before it would get" to his level (Doc. 193-3, pp. 14-15). In essence, Johnson seeks to pin liability on Baldwin because he was the director with responsibility over all of the institutions, but Baldwin cannot be liable simply for his position as director. He must have knowledge of the conduct and express "deliberate, reckless indifference." *Sanville*, 266 F.3d at 740. There is no evidence in the record that Baldwin was aware of the implementation of the grooming policy at Menard, let alone that he acted with reckless indifference. Accordingly, Baldwin is entitled to summary judgment on Count 1.

### B. Baldwin (official capacity), Carter, and Witthoft First Amendment Policy Claim

"Although prisoners enjoy rights under the free-exercise clause of the [F]irst [A]mendment…, many decisions hold that these rights are subject to limits appropriate

to the nature of prison life." *Vinning-El*, 657 F.3d at 592-93. Thus, restrictions are permissible if they are "reasonably related to legitimate penological interests." *Al-Alamin v. Gramley*, 926 F.2d 680, 685 (7th Cir. 1991). To determine whether a regulation is reasonably related, the Court considers the following factors: (1) whether a valid, rational connection exists between the regulation and a legitimate government interest behind the rule; (2) whether there are alternative means of exercising the right in question that remain available; (3) the impact accommodation of the right would have on guards and other inmates; and (4) the existence of obvious, easy alternatives. *Beard v. Banks*, 548 U.S. 521, 529 (2006) (citing *Turner v. Safley*, 482 U.S. 78, 89-90 (1987)).

"[C]ase law recognizes the need for and validity of rules regulating the hairstyles of prisoners in the interest of security." *Lewis v. Sternes*, 712 F.3d 1083, 1085 (7th Cir. 2013). The Seventh Circuit has even stated that a categorical ban on long hair, justified by security concerns, would likely be permissible. *Grayson v. Schuler*, 666 F.3d 450, 452 (7th Cir. 2020). Courts routinely uphold grooming policies based upon safety and security concerns. *See L.C. Johnson v. McCann*, Case No. 08 C 4684, 2010 WL 2104640, at *6 (N.D. Ill. May 21, 2010) (collecting cases); *Williams v. Snyder*, 367 F. App'x 679, 683 (7th Cir. 2010) (finding grooming policy which banned dreadlocks did not violate RLUIPA because of security issues and inadequacy of search methods); *Njie v. Dorethy*, 766 F. App'x 387, 391 (7th Cir. 2019) (upholding ban on dreadlocks).

Here, the Court finds that Defendants have demonstrated that there is a legitimate penological interest in cutting Johnson's dreadlocks. Administrative Directive 05.03.160 defines hairstyles that impose a security risk as one that "(a) impedes and prevents staff

from conducting a thorough search of the hair for contraband; (b) [c]ontraband hidden in the hair may not be detected; (c) [c]ontraband hidden in the hair may injure staff attempting to search the hair." (Doc. 193-8). Defendants also offered the testimony of John Carter regarding Johnson's hairstyle (Doc. 193-4). Carter testified that there were security issues with Johnson's hairstyle, which he explained to Johnson at the time of the haircut (*Id*. at p. 20). He testified that Johnson's hairstyle was very long, constrictive type braids that could not be manually removed by either Johnson or staff (*Id*. at p. 33). Further, Johnson could not separate the braids by running his fingers through his hair, making it unsearchable (*Id*.). Given the nature of the braids, Carter testified that there could be unseen hazards concealed in them (*Id*. at pp. 33-34). Carter testified he had seen sewing needles concealed in similar hairstyles (*Id*. at p. 34). Johnson acknowledged in his own testimony that his dreadlocks were past his waist and that they were much longer than the average prisoner with dreadlocks (Doc. 193-1, pp. 74-75).

Johnson does not offer any evidence to rebut Defendants' legitimate penological interest. Instead, he argues that Carter's statements were vague and did not indicate that Johnson's hair posed a security risk. But Carter specifically discussed the issues with the size and manner of Johnson's hair. He also testified as to the reasons why Johnson's hair was not searchable in its current form. Johnson himself also testified that his hair was unlike most inmates with dreadlocks. Defendants have clearly presented unrebutted evidence of a legitimate penological interest in cutting Johnson's hair.

As to the remaining factors, the evidence suggests that Johnson was able to practice other aspects of his religion. He testified that, while at Menard, he was able to

pray and eat a lot of fish per his diet (Doc. 193-1, pp. 75-76). Although he testified that his books were confiscated when he went to segregation and some were missing upon his transfer to Menard, nothing in his testimony indicated that he was not allowed to have religious texts in general population (*Id*.). Although Johnson argues that for several years he was able to maintain his hairstyle without it being deemed a security threat, he did not offer any testimony as to how searches were conducted at those facilities or the state of his hair while at those facilities.[2] Johnson did testify, however, that by the time he arrived at Menard, his dreadlocks were longer than the average inmate with dreadlocks, and Carter testified that the individual braids were unable to be undone in order to be searched. *Holmes v. Engleson*, Case No. 16 C 5234, 2017 WL 3421499, at * 8 (N.D. Ill. Aug. 9, 2017) (Although guards can run hands between the locks, "courts have explained that the chief concern is contraband might be concealed *within* an individual lock." (citing *Grayson*, 666 F.3d at 452)). Thus, there is no evidence to suggest that there was an easy alternative as Johnson argues.

Further, even if Johnson established a constitutional violation, Defendants are entitled to qualified immunity because the right of Johnson to maintain his dreadlocks was not clearly established. To overcome a defense of qualified immunity, a plaintiff must demonstrate "(1) that the [defendant's] conduct violated his constitutional rights, and

---

[2] Johnson's response indicates that he underwent searches of his dreadlocks without issue for several years and maintained a dreadlocked hairstyle but offers no citation in the record for the method of those searches or the state of his dreadlocks at that time. There is no indication whether his head was searched with the dreadlocks or if Johnson was able to remove each braid during searches.

(2) that the violated right was clearly established at the time of the alleged misconduct." *Lewis v. Downey,* 581 F.3d 467, 478 (7th Cir. 2009). "[T]he clearly established right must be defined with specificity." *City of Escondido, Cal. v. Emmons*, 139 S. Ct. 500, 503 (2019). While a plaintiff is not required to cite "a case directly on point for a right to be clearly established, existing precedent must have placed the statutory or constitutional question beyond debate." *White v. Pauly*, 137 S. Ct. 548, 551 (2017) (quotations omitted). The right must be established "not as a broad general proposition." *Reichle v. Howards*, 566 U.S. 658, 665 (2012). Instead, it must be "particularized" such that the "contours" of it are clear to a reasonable official. *Id.*

Although Johnson argues that it is well established that inmates retain the right to practice their religion while in prison, he fails to cite to any caselaw establishing a right of an inmate to maintain dreadlocks in violation of a prison grooming policy. In fact, the overwhelming caselaw finds that such policies are constitutional. *See Holmes*, 2017 WL 3421499, at * 8 ("The Court is unaware of any cases holding that the application of the standard prison grooming policy violates a Rastafarian's constitutional rights under the First Amendment, much less that any particular application of the policy (absent an improper purpose not present here) does so."); *L.C. Johnson*, 2010 WL 2104640, at *6 (collecting cases); *Williams*, 367 F. App'x at 683; *Njia*, 766 F. App'x at 391. Because the right at issue here was not clearly established, summary judgment is **GRANTED** for Defendants Baldwin, Carter, and Witthoft as to Counts 1 and 4.

## C. RLUIPA

The Religious Land Use and Institutionalized Persons Act, 42 U.S.C. §§ 2000cc *et*

*seq.*, ("RLUIPA") provides that:

> No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution, ... even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of the burden on that person-
>
> (1) is in furtherance of a compelling governmental interest; and
>
> (2) is the least restrictive means of furthering that compelling governmental interest.

42 U.S.C. § 2000cc-1(a). The court must afford great deference to prison officials regarding what constitutes a security risk in prison and how that risk is best reduced. *Conyers v. Abitz*, 416 F.3d 580 (7th Cir. 2005) (courts "generally defer to the judgment of prison officials when they are evaluating what is necessary to preserve institutional order and discipline"). RLUIPA is to be applied "in an appropriately balanced way, with particular sensitivity to security concerns." *Cutter v. Wilkinson*, 544 U.S. 709, 722 (2005). Johnson bears the burden of demonstrating that the policy "substantially burdened [his] exercise of religion." *Holt v. Hobbs*, 574 U.S. 352, 361 (2015).[3] The burden then switches to Defendants to show that the refusal to allow Johnson to maintain his dreadlocks was "in furtherance of a compelling government interest" and was "the least restrictive means" of furthering that interest. *Id.* at 362.

But RLUIPA only provides for injunctive relief and not monetary damages. *Grayson*, 666 F.3d at 451. Requests for injunctive relief are moot when an inmate is no

---

[3] Defendants do not dispute whether Johnson's hairstyle was "grounded in a sincerely held religious belief." *Holt*, 574 U.S. at 361.

longer at the facility at issue and he has "not shown a realistic possibility that he will again be incarcerated in the same state facility and therefore be subject to the actions of which he complains." *Maddox v. Love*, 655 F.3d 709, 716 (7th Cir. 2011). Johnson is not currently housed at Menard Correctional Center and is instead housed at Lawrence Correctional Center. In fact, he has been at Lawrence Correctional Center since March 21, 2019 (Doc. 193-1, p. 16). Johnson fails to offer any evidence that he has been subjected to the grooming policy requiring cutting of his dreadlocks at Lawrence, and he acknowledged that he was able to maintain a dreadlocked hairstyle at other prisons (Doc. 193-1, pp. 74-75). Although he testified that he had access to religious services and books at Lawrence, he fails to point to any testimony as to the grooming policy at Lawrence. Nor has he shown that he is likely to be transferred back to Menard Correctional Center and face an inability to grow and maintain dreadlocks again.

Johnson argues that his request for injunctive relief is not moot because he challenges IDOC's grooming policy, which applies at all prisons. *West v. Grams*, 607 F. App'x 561, 566 (7th Cir. 2015) (Although "a prison transfer might moot a claim for injunctive relief if the transfer means that the inmate no longer is laboring under the allegedly unconstitutional policy or practice" the lawsuit challenged a system-wide policy.). According to Johnson he could be subject to a forced haircut at any time at any facility. But John Baldwin testified that although the grooming policy is drafted by state officials, "the institution can modify it to fit their specific needs at that institution." (Doc. 193-3, p. 15). Likewise, John Carter testified that whether a hairstyle posed a security risk was based on the wardens at each facility (Doc. 193-4, p. 38). There is no

indication that the facility Johnson is currently at will not allow dreadlocks, and he acknowledged that at other facilities he was able to grow dreadlocks. Further, the injunctive relief sought by Johnson was a transfer to another prison, and he has since been transferred (Doc. 19, p. 21). Accordingly, he has no claim for injunctive relief in light of his transfer, and his RLUIPA claim fails. *See Maddox*, 655 F.3d at 717 (RLUIPA claim moot when inmate was transferred to a different prison).

### D. Hasemeyer

As to Hasemeyer, he alleges that he was not on duty on June 23, 2017, during the alleged use of force. But Johnson offers evidence in the record from which a jury could find that Hasemeyer was on duty. His timesheet indicates that he was working on June 22, 2017, and he also signed an incident report related to the incident with Johnson on June 23, 2017, at 4:00 a.m. (Docs. 202-6 and 202-7). Further, Johnson offers affidavits from two inmates, Joseph Tillman and Kentes West, indicating that they saw Hasemeyer on the 11:00 p.m. to 7:00 a.m. shift at Johnson's cell directing officers to pull Johnson out of his cell (Docs. 202-4, p. 6; 202-5, pp. 4-5). Contrary to Hasemeyer's argument that there is no evidence of personal involvement on June 23, 2017, there is evidence that he was present overnight from June 22, 2017, to June 23, 2017, and participated in the removal of Johnson from his cell. Accordingly, he is not entitled to summary judgment.

### E. Dudzinski

As to Dudzinski, Johnson concedes that he is entitled to summary judgment on Count 8.

As to Count 12, which alleges cruel and unusual punishment related to urinating

on Johnson's food and spitting in his face, the events took place on July 3, 2017. Johnson argues that although IDOC records indicate that Dudzinski was not on duty on July 3, 2017, Dudzinski admitted in response to Johnson's first requests for admissions that he worked on July 3, 2017 (Doc. 202-8, p. 3). Dudzinski has since filed a motion to withdraw those admissions (Doc. 203). Dudzinski argues that his counsel made a mistake in compiling his responses to the requests for admissions and that IDOC records, including the Roster Management and his own timesheet, indicate that he was not on duty at Menard on July 3, 2017 (Docs. 193-7 and 193-11). Johnson does not object to the motion to withdraw. The records clearly reflect that his initial admission was incorrect. *See Johnson v. Target Corp.*, 487 F. App'x 298, 300 (7th Cir. 2012). Thus, the motion to withdraw Dudzinski's admissions (Doc. 203) is **GRANTED**.

Without Dudzinski's admission, the evidence clearly indicates that Dudzinski was not present on July 3, 2017. Dudzinski's timesheet indicates that he took 7.5 hours of Accumulated Holiday Leave on July 3, 2017 (Doc. 193-7, p. 1). The roster from that date also reflects that Dudzinski was initially scheduled to be in North 2 but took 7.5 hours of Holiday Leave (Doc. 193-11, pp. 22, 30). Due to Dudzinski's absence, Ezra Hunter was assigned to North 2 (*Id.* at p. 22). Because Dudzinski was not present on July 3, 2017, he could not have been the officer who spit on Johnson and urinated on his food. Thus, Dudzinski is entitled to summary judgment as to Count 12.

## CONCLUSION

For the reasons stated above, Defendant Baldwin is **GRANTED** summary judgment on Counts 1, 2, and 3. Defendants Carter and Witthoft are **GRANTED**

Page 17 of 20

summary judgment on Count 4. Hasemeyer is **DENIED** summary judgment as to Count

8. Dudzinski is **GRANTED** summary judgment on both Counts 8 and 12.

Accordingly, the following counts remain for trial:

Count 5:     Lashbrook attempted to discourage Johnson from complaining about his treatment at Menard by threatening him with further abuse at the hands of corrections officers, in violation of the First Amendment.

Count 6:     Lashbrook directed corrections officers to subject Johnson to unconstitutional conditions of confinement and excessive force, in violation of the Eighth Amendment.

Count 7:     McCaleb, W. Engelage, Brumleve, Lindenberg, Jones, and Hoffman subjected Johnson to excessive force on June 22, 2017, by beating him in violation of the Eighth Amendment.

Count 8:     Hasemeyer, Dotson, Ellenberg, Compton, and Adams subjected Johnson to excessive force on June 23, 2017, by beating him or directing others to beat him in violation of the Eighth Amendment.

Count 9:     Witthoft and Dudzinski subjected Johnson to excessive force on June 26, 2017, by beating him or failing to intervene in his beating, in violation of the Eighth Amendment.

Count 10:    Witthoft subjected Johnson to excessive force on June 26, 2017, by sticking him with a needle multiple times, in violation of the Eighth Amendment.

Count 11:    Lindenberg, Dulaney, Dudzinski, Brumleve, McCaleb, W. Engelage, and Griffin subjected Johnson to unconstitutional conditions of confinement by depriving him of meals and running water, forcing him to sleep nude on his cell floor without bedding, and unplugging his fan in the middle of the summary, among other things, in violation of the Eighth Amendment.

Count 12:    McCaleb subjected Johnson to cruel and unusual punishment on July 3, 2017, by urinating on his food and spitting in his face, in violation of the Eighth Amendment.

Count 13:    R. Engelage were deliberately indifferent to the injuries Johnson sustained in the June attacks, in violation of the Eighth Amendment.

Count 14:    Defendants intentionally inflicted emotional distress upon Johnson from at least June 22, 2017, to July 3, 2017, in violation of Illinois law and as described in Counts 5-13 herein.

A status conference will be set by separate order for the purpose of discussing a settlement conference and setting a firm trial date and final pretrial conference.

**IT IS SO ORDERED.**

**DATED:**   **September 6, 2022**

**NANCY J. ROSENSTENGEL**
**Chief U.S. District Judge**